IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DANYELL WEST ON BEHALF OF A.R.M.,**

    **Plaintiff,**

                                      Civil Action 2:13-cv-277
                                      Magistrate Judge Elizabeth P. Deavers

    v.

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

## OPINION AND ORDER

Plaintiff, A.R.M., brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for child's supplemental security income. This matter is before the Court for consideration of Plaintiff's Statement of Errors (ECF No. 12), the Commissioner's Memorandum in Opposition (ECF No. 14), Plaintiff's Reply (ECF No. 17), and the administrative record (ECF No. 11). For the reasons that follow, Plaintiff's Statement of Errors is **OVERRULED**, and the Commissioner's decision is **AFFIRMED**.

### I.    BACKGROUND

Plaintiff, through his mother, Danyell West ("West"), protectively filed his application for child's supplemental security income on April 27, 2010, alleging that he has been disabled since January 1, 2010, from a learning disability, attention deficit hyperactivity disorder

("ADHD"),[1] asthma, childhood schizophrenia, and bi-polar disorder. (R. at 117-19, 180.) Plaintiff's application was denied initially and upon reconsideration. Plaintiff subsequently requested a *de novo* hearing before an administrative law judge. On December 8, 2011, Administrative Law Judge Timothy K. Keller ("ALJ") held a hearing at which Plaintiff and his mother, represented by counsel, appeared and testified. (R. at 42-52.) On December 28, 2011, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act. (R. at 20-34.) On January 30, 2013, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-4.) Plaintiff then timely commenced the instant action.

## II.    HEARING TESTIMONY

### A.    Plaintiff's Mother's Testimony

West testified that she noticed difficulties with her son when he was first born, explaining that he had to be resuscitated because he was not breathing. (R. at 45.) She reported that Plaintiff was slow to reach his milestones and had difficulty upon beginning school, including learning disabilities, difficulty focusing, and getting into trouble. (R. at 45-46.) Plaintiff has had an Individual Education Plan ("IEP") since he began school, but has never been held back a grade. (R. at 46.) West reported that Plaintiff's grades were "up and down." She indicated that Plaintiff's sister helps him with his homework and teaches him reading. (R. at 47.) She added

---

[1] "Attention Deficit Hyperactivity Disorder" or "ADHD" is a childhood mental disorder characterized by inattention (such a distractibility, forgetfulness, not finishing tasks, and not appearing to listen), hyperactivity, and impulsivity (such as fidgeting and squirming, difficulty in remaining seated, excessive running or climbing, feelings of restlessness, difficulty awaiting one's turn, interrupting others, and excessive talking) or by both types of behavior. *See* Dorland's Illustrated Medical Dictionary 528 (29th ed. 2000).

that Plaintiff "doesn't want to do what he is told" and that he needs breaks to complete his chores. (*Id.*) She also indicated that Plaintiff encounters difficulty when learning how to play games and will get frustrated and give up. West testified that gets bored after watching television and when outside, will "take off if you don't keep an eye on him." (R. at 48.) West also testified that Plaintiff is easily upset and often gets his feelings hurt. She reported that when he is hurt or angry, he hits things and that he has outbursts everyday.

**B.      Plaintiff's Testimony**

Plaintiff testified at the December 8, 2011 hearing that he was in the sixth grade and liked his teachers but did not have a favorite class. (R. at 43.) He indicated that math was difficult for him and that he also experienced difficulty with reading. (*Id.*) He testified that he had a number of friends and enjoyed recess. (R. at 44.) Plaintiff stated that he often gets into trouble at school because he hits and spits, causing him to have to go to detention. He also indicated that he does not get along with his sister.

### III.    MEDICAL RECORDS AND OPINIONS

**A.      Shelly Gittens, M.D.**

Plaintiff treated with pediatrician Dr. Gittens from April 2007 through March 2011. (R. at 312-59, 365-77.) When initially seen by Dr. Gittens, Plaintiff was in the first grade and requested an evaluation to determine whether he had ADHD. West reported that Plaintiff would only listen to his dad and that she would have to repeat things multiple times before he would listen. (R. at 320.) She also reported that Plaintiff tended to start fights with his sisters and would scream, yell, kick, and punch. West indicated that he engaged in daredevil activity and

3

had difficulty focusing. Dr. Gittens assessed ADHD and Oppositional Defiant Disorder ("ODD")[2] and prescribed Strattera. (R. at 323.)

Generally, Dr. Gittens' clinical notes show that West repeatedly reported that Plaintiff had trouble with sitting still, did not follow rules, and had trouble focusing. (R. at 312, 316, 319, 350, 365.) Dr. Gittens prescribed, changed, or increased several medications while she treated Plaintiff: Seroquel for sleep; Adderall, Concerta, and Strattera for ADHD; inhaler for asthma; a breathing machine; Risperdal and Zyprexa for possible bipolar disorder; and Trazodone, an anti-depressant. (R. at 315, 317, 323, 328, 343, 366, 372.) Plaintiff told Dr. Gittens that he heard voices and had nightmares. (R. at 314, 316.) Dr. Gittens referred Plaintiff for an evaluation at Moundbuilders Mental Health Center for possible bi-polar disorder. (R. at 319.)

West reported to Dr. Gittens in January 2009 that Plaintiff had difficulty staying on task after only ten minutes. (R. at 350.) In November 2009, because West reported to Dr. Gittens that Plaintiff had been off his medication since the summer, she changed Plaintiff's medication. (R. at 344-48.) In January 2010, West reported to Dr. Gittens that Plaintiff's behavior at home had improved. (R. at 340.)

In November 2010, Dr. Gittens noted that Plaintiff was struggling academically, and she "encouraged mom to review IEP and have more contact with school teacher." (R. at 368.)

---

[2]"Oppositional Defiant Disorder is a recurrent pattern of negativistic, defiant, disobedient, and hostile behavior toward authority figures that persists for at least six months and is characterized by the frequent occurrence of at least four of the following behaviors: losing temper, arguing with adults, deliberately doing things that will annoy other people, blaming others for his own mistakes or misbehavior, being touchy or easily annoyed by others, being angry and resentful, or being spiteful or vindictive. The behaviors must occur more frequently than is typically observed in individuals of comparable age and developmental level and lead to significant impairment in social, academic, or occupational functioning. In a significant proportion of cases this disorder is a developmental antecedent to Conduct Disorder. DSM-IV." *Goodman ex rei. Chambers* v. *Barnhart,* 247 F. Supp.2d 1249, 1251 (N.D. Ala. 2003).

**B.     Lee Roach, Ph.D.**

In December 2007, Plaintiff saw psychologist Dr. Roach for assessment in connection with his application for social security disability benefits.  (R. 300-04.)  West reported that Plaintiff's mood changes.  (*Id.*)  She also reported that Plaintiff "wants to break a bottle and cut people."  (R. at 302.)  She further reported that Plaintiff sees shadows and ghosts.  (*Id.*)

Dr. Roach noted that Plaintiff was "very responsive with good eye contact."  (R. at 301.)  He also noted that Plaintiff substitutes "F" for "T" and that he is in speech therapy at school, but that "[h]is speech was understandable 95% of the time" and that his conversational flow was coherent and adequate.  (R. at 301.)  Testing with the Wechsler Intelligence Scale for Children - Fourth Edition (WISC-IV) resulted in a full scale IQ of 81.  (R. at 305.)  Dr. Roach noted that Plaintiff's general cognitive ability was within the borderline range.  (R. at 302–03.)

Dr. Roach found that Plaintiff demonstrated immaturity and inadequate insight into his learning problems.  He also found that Plaintiff's reasoning and judgment capabilities in peer interaction activities were below age-appropriate.  (*Id.*)  Plaintiff did, however, demonstrate adequate memory/recall-attention span and functional long-term memory.  Dr. Roach assessed ADHD, combined type, and borderline intellectual functioning and assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 60.[3]  (R. at 303.)  Dr. Roach concluded that

---

[3]The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning.  Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range.  *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at pp. 32-34 ("DSM-IV-TR").  A GAF score of 60 is indicative of moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g*., few friends, conflicts with peers or co-workers).  DSM-IV-TR at 32-34.

Plaintiff's communication and motor abilities were not impaired; his cognition was mildly impaired; and his social/emotional skills, personal/behavioral patterns, and concentration were all moderately impaired. (R. at 304.)

**C.     Marc Miller, Ph.D.**

In July 2010, Plaintiff was evaluated on behalf of the state agency by Marc Miller, Ph.D. (R. at 360-64.) Plaintiff reported he did not have friends and becomes upset when others tease him. Plaintiff indicated that he liked school, but did have suspensions in the past. Plaintiff appeared neat in appearance and was appropriately groomed. In connection with his mental status examination, Dr. Miller noted that Plaintiff was friendly, smiled frequently, responded well to praise, and was cooperative. He also indicated that Plaintiff's activity levels were within the average range. Dr. Miller noted that Plaintiff demonstrated "good expressive/receptive skills" and that he was able to understand "100% of his speech." (R. at 362.) Dr. Miller observed that Plaintiff spoke in an immature and child-like manner, but speculated that this could be attention-seeking behavior. Dr. Miller placed Plaintiff's hyperactivity as approximately two on a ten-point scale, noting the evaluation took place while Plaintiff was medicated. (*Id.*)

West reported that Plaintiff is easily frustrated and gives up quickly. West also reported that Plaintiff did not fall asleep until 1:00 or 2:00 a.m., and that he could only be awoken at 7 a.m. for school with great difficulty. (*Id.*) Plaintiff reported nightmares and possible hallucinations.

Dr. Miller assessed ADHD combined type and borderline intellectual functioning and assigned Plaintiff a GAF score of "45 during the past week," indicative of serious symptoms, but generally a GAF score of 55, indicative of moderate symptoms. (R. at 364.) Dr. Miller

concluded that Plaintiff's concentration, attention span, and distractibility were all "fair to poor," and that Plaintiff had difficulty with time management and organization.

**D.     Anton Freihofner, M.D./Vicki Warren, Ph.D.**

In August 2010, state-agency psychologist Dr. Warren and state-agency physician Dr. Freihofner reviewed the record initially and opined that Plaintiff did not meet, medically equal, or functionally equal any listing. (R. at 53-60.) They opined Plaintiff had marked impairment in the domain of attending and completing tasks based on his IEP; less than marked in the domain of acquiring and using information and interacting and relating with others; and no limitation in the remaining domains. (R. at 57-58.) They opined that although Plaintiff has "behavioral problems and difficulty with his school work, his condition is not so severe that it would be considered disabling." (R. at 59.) In reaching these conclusions, the Drs. Warren and Freihofner accorded controlling weight to the conclusions of Dr. Miller and found that Dr. Roach's conclusions did not represent Plaintiff's current functioning.

**E.     Teresita Cruz, M.D./Kristen Haskins, Psy.D.**

Upon reconsideration in December 2010, state-agency physician Dr. Cruz and state-agency psychologist Dr. Haskins determined that Plaintiff's impairments failed to meet or functionally equal any of the listings. (R. at 63-71.) They also found that Plaintiff had only one marked limitation in attending and completing tasks. (R. at 68.)

**F.     Thomas Mak, M.D.**

Plaintiff was initially evaluated by child psychiatrist Dr. Mak in December 2010, when he was 11 ½ years old. (R. at 411-14.) He was referred for aggressive behavior, ADHD, and seeing things at night. West reported that Plaintiff hears his name called once in a while, sees

7

ghosts, and talks in his sleep.  She also reported that Plaintiff has difficulty following directions and tantrums when things do not go his way.  She added that Plaintiff can be aggressive, but that it is better this year.  Plaintiff reported being sometimes sad or angry, usually when he is frustrated. West reported that Plaintiff is under an IEP, and depending on the day, he does well or is removed.  On mental status examination, Plaintiff was euthymic, he had full affect, and was hyperactive and restless.  Dr. Mak diagnosed ADHD and ODD and rule out mood disorder and bipolar.  Dr. Mak assigned a GAF score of 60.  (R. at 413.)   Dr. Mak prescribed an increase in Seroquel and Vyvanse.  (R. at 414.)

In March 2011, Plaintiff was sleeping better, his grades were improving.  West reported that Plaintiff was less oppositional and that she had fewer concerns about hallucinations. (R. at 407-08.)

In June 2011, Plaintiff reported he had a good finish to his school year, that he had improved his grades, that had won a "superworker" award, and that he was moving on to 6th grade. (R. at 405-06.)  Dr. Mak also noted that although Plaintiff was still having some differences with his sister and was grounded for stealing cookies, his behavior was "pretty good."  (*Id.*)

In October 2011, Plaintiff reported that he was doing fairly well in the 6th grade and that he is getting a lot of help from aides.  Dr. Mak noted "some rambunctiousness," but that Plaitniff was not getting into any "serious trouble" at school.  (R. at 403.)  He also noted that Plaintiff was making friends.  Plaintiff denied hearing voices, but West reported that he was still hearing them. She added that Plaintiff wakes up and comes downstairs fearful.  Dr. Mak noted that he believed Plaintiff's hallucinations were likely hypnagogic in nature.  Dr. Mak also noted that Plaintiff was

8

tolerant and compliant with medication. (*Id.*) Dr. Mak kept his medication the same and observed that "[o]verall [Plaintiff] seems to be functioning okay." (R. at 404.)

## IV. SCHOOL RECORDS

Plaintiff's 2008/2009 interim school reports indicated that Plaintiff needed to "prepare more for tests" and that he was missing homework assignments. (R. at 127-32.) His teacher noted that Plaintiff has "a lot of trouble staying focused and on-task" and that "[h]e really needs to study for tests." (R. at 130.)

On a progress report for his IEP for the 2009/2010 school year, his teacher noted in October 2009 that "coming to class prepared continues to be a problem for [Plaintiff]. He has the skills and he needs to practice them at home." (R. at 133.) Plaintiff's teacher noted on the January 2010 progress report that Plaintiff had "made tremendous progress in his reading. He passed Text Level J which was 2 levels above his goal for this IEP." (R. at 139.)

The IEP review dated April 2010, which had been prepared for the 2010/2011 school year, indicated that Plaintiff does not come to school prepared or with completed assignments and that he behaves immaturely compared to his peers. (R. at 200.) It further reflected that Plaintiff's "listening comprehension [was] at a 5th grade level." (*Id.*) Plaintiff was to receive regular instruction for science, social studies, and health and modified instruction for reading, writing, and math. (R. at 204, 207.) It was further determined that Plaintiff required special education services outside of class less than 21% of the day. (R. at 210.) Plaintiff's parents failed to attend the IEP meeting. (R. at 208.)

On June 3, 2010, Judith McNeigh completed a teacher's questionnaire on behalf of the state agency. (R. at 189-98.) Ms. McNeigh noted that Plaintiff had a serious problem in

9

understanding school content and vocabulary, reading and comprehending written material, recalling and applying previous material, and applying problem-solving skills in discussion. (R. at 190.) Ms. McNeigh also reported he had a very serious problem with providing oral explanations and adequate descriptions as well as expressing ideas in written form. (*Id.*) Ms. McNeigh further noted that even though Plaintiff has an inhaler for asthma, she had never seen him use it during the 2009/2010 school year. (R. at 195.)

On November 9, 2010, Plaintiff's 5th grade teacher and 5th grade intervention specialist prepared a narrative response to the state-agency teacher questionnaire in which they noted that they did "not feel that there is an applicable reason to complete the form." (R. at 235.) They opined that Plaintiff is "perfectly capable of being self sufficient as he grows . . . . He does not show any reason why he would not finish school, high school included, and graduate a functioning member of our society." (R. at 235.)

The March 2011 IEP review for the 2011/2012 school year also determined that Plaintiff required Special Education services outside of class less than 21% of the day. (R. at 253.) Plaintiff's intervention specialists found that Plaintiff could form sentences at the 6th-grade level, and "write a story that conveys a clear message and can use precise language to create a picture in the reader's mind . . . ." (R. at 261.) They also indicated that Plaintiff "does a great job of sounding out unknown words and does use his Quick Word Resources to locate the spelling of words he does not know." (R. at 261.)

In September 2011, Plaintiff's Intervention Specialist for his sixth grade school year, Shannon Davies, reported that he is typically off task and constantly needs re-direction when given instructions. (R. at 274.) Plaintiff was at a reading and math level of a 3rd grader, with

achievement testing placing him at a 5th-grade level. She also noted that "[h]is team is very concerned about his lack of being focused in class, in a small group, or 1-1." (R. at 277.) Ms. Davies also noted that Plaintiff also has problems explaining what he means and that it is difficult for Plaintiff to get out what he is trying to say. (R. at 275.) Ms. Davies reported that Plaintiff is on an IEP and had a cognitive disability in math, reading, and writing. (R. at 276.)

## V. THE ADMINISTRATIVE DECISION

On December 28, 2011, the ALJ issued his decision. (R. at 20-34.) The ALJ found that Plaintiff has ADHD, ODD, and bipolar disorder that are "severe" within the meaning of 20 C.F.R. §416.924(c). (R. at 26.) He concluded, however, that Plaintiff does not have an impairment or combination of impairments that meets or medically meets or equals the severity of any impairments listed in Part B of Appendix 1 to Subpart P, 20 C.F.R. Part 404. (*Id.*) In the six domains used to determine a child's functional equivalence,[4] the ALJ found that Plaintiff had no limitation in the domains of moving about and manipulating objects and caring for oneself; "less than marked" limitation in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and health and physical well-being. (R. at 29-34.) The ALJ determined that Plaintiff did not have "marked" or "extreme" limitations in

---

[4]For an impairment or combination of impairments to be functionally equivalent to a listed impairment, the child must have "marked" limitations in two functional areas or an "extreme" limitation in one functional area. To make this determination, it is necessary to evaluate the child's abilities in six "domains": (1) the ability to acquire and use information; (2) the ability to attend to and complete tasks; (3) the ability to interact and relate with others; (4) the ability to move about and manipulate objects; (5) the ability to care for oneself; and (6) one's general health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

11

any area of functioning. The ALJ therefore concluded that Plaintiff is not disabled within the meaning of the Social Security Act. (R. at 34.)

## VI.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant

of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VII.  ANALYSIS

In his Statement of Errors, Plaintiff asserts that the ALJ erred in failing to find that his limitations in the domains of acquiring and using information and attending and completing tasks were not markedly limited.  (ECF No. 12).  He does not, however, challenge the ALJ's determinations with regard to the remaining domains.  Because the Court finds that substantial evidence supports the ALJ's determination that Plaintiff was not markedly limited in the domain of acquiring and using information, it is unnecessary for the Court to consider whether the ALJ erred in his determination with regard to the domain of attending and completing tasks.

For childhood disability claims, a three-step inquiry applies.  20 C.F.R. § 416.924.  "The questions are (1) is the claimant working, (2) does the claimant have a severe, medically determinable impairment, and (3) does the impairment meet or equal the listings?" *Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 832 (6th Cir. 2009).  Here, Plaintiff maintains that he functionally equals the listings.  Section 416.926a, which sets forth the criteria for functional equivalence to a listing, divides and measures functional equivalency into the following six domains:

(1) Acquiring and using information;

(2) Attending and completing tasks;

(3) Interacting and relating with others;

(4) Moving about and manipulating objects;

(5) Caring for yourself; and

13

    (6) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1). "To establish a functional impairment equal to the listings, the claimant has to show an extreme limitation in one domain or a marked impairment in more than one." *Kelly*, 314 F. App'x at 832 (citing 20 C.F.R. § 416.926a(d)).

    In the instant action, Plaintiff contends that he has demonstrated a marked impairment in the domains of acquiring and using information and attending and completing tasks. The regulations explain that "Marked' limitation" "means a limitation that is 'more than moderate' but 'less than extreme' [and] . . . the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(i).

    In analyzing the domains, the ALJ noted that "no acceptable medical source had mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination." (R. at 26.) He further noted that the state-agency examiners determined that Plaintiff's impairments "failed to functionally equal the listings . . . ." (*Id.*) After analyzing the record evidence, including the hearing testimony, Plaintiff's school records, and medical records from Drs. Gittens, Miller, and Mak, the ALJ concluded that Plaintiff had "less than marked limitation in acquiring and using information," explaining as follows:

> [Plaintiff] has not been retained in any grade per school records and obtained a full scale IQ of 81 in July 2005. He has an IEP since the first grade and a current IEP for reading, math and science . . . . On September 7, 2011, Shannon Davies, Intervention Specialist, reported that claimant had a cognitive disability in reading, writing and math, but no speech, language or communication problems. The claimant was in the sixth grade and reading at the end of the third grade level and at the third grade level in math . . . .

14

(R. at 30 (internal citations to the record omitted).)  He also noted Plaintiff has not been held back in school and that Dr. Mak's treatment notes from January, May, and October 2011 reflected that Plaintiff was doing well in fifth grade, had a good finish to his fifth-grade school year, and was doing well in sixth grade.  (R. at 29.)

The Court finds that substantial evidence supports the ALJ's determination with regard to the domain of acquiring and using information.  As the ALJ pointed out, *all four* of the state-agency reviewing psychologists and physicians determined that Plaintiff did not meet or equal the listing and further opined that he had less than marked limitation in the domain of acquiring and using information.  (R. 53-60, 63-71.)  The ALJ also considered Plaintiff's medical records, including records from Drs. Gittens, Miller, and Mak, and correctly pointed out that no medical evidence contradicted or undermined the state-agency psychologists' and physicians' opinions.  *See Kelly*, 314 F. App'x at 832–33 (substantial evidence supported ALJ's determination with regard to a particular domain where the state-agency physicians reached the same conclusion and no medical evidence contradicted the state-agency opinions).  The ALJ likewise properly considered Plaintiff's reading and math levels as well as his IQ score, which was not "at least two" standard deviations below the mean.  *See* 20 C.F.R. § 416.926a(e)(ii) ("[W]e will consider [test scores] together with the information we have about your functioning to determine whether you have 'marked' or 'extreme' limitation in a domain"); 20 C.F.R. § 416.926a(e)(2)(i) (marked impairment contemplates testing scores that "are at least two, but less than three, standard deviations below the mean").

The evidence Plaintiff contends supports a contrary conclusion with regard to the domain of requiring and using evidence, including portions of West's testimony and notations from

15

teachers and physicians, do not clearly evidence marked impairment.  Plaintiff offers no authority demonstrating that the ALJ was required to credit the evidence he cites over the record evidence upon which the ALJ relied and the medical source and state-agency consultants' opinions.  Moreover, as noted above, the central inquiry is whether substantial evidence supports the ALJ's determination, not whether evidence could have also supported the opposite conclusion.  *Blakley*, 581 F.3d at 406.  With regard to the ALJ's determination concerning the domain of requiring and using evidence, the substantial-evidence threshold is readily established.

This finding makes it unnecessary to consider Plaintiff's remaining asserted error, that the ALJ erred in failing to conclude that he has marked impairment attending and completing tasks.  The ALJ found that Plaintiff had not demonstrated marked impairment in any of the domains.

As set forth above, a claimant must show marked impairment in *two* domains to establish functional equivalence.  *Kelly*, 314 F. App'x at 832 (citing 20 C.F.R. § 416.926a(d)).  Thus, even if the Court sustained Plaintiff's remaining challenge that relates to one domain, it would not provide a basis for reversal.  Any error would be harmless to the ALJ's ultimate determination that Plaintiff failed to establish a functional impairment equal to the listings.

### VIII.  DISPOSITION

In sum, from a review of the record as a whole, the Court concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, Plaintiff's Statement of Errors is **OVERRULED**, and the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED**.


Date:   August 27, 2014                             /s/ *Elizabeth A. Preston Deavers*
                                                                    Elizabeth A. Preston Deavers
                                                                    United States Magistrate Judge